UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
JACK FERRANTI,                                  :
                                                :
                          Petitioner,           :       **MEMORANDUM & ORDER**
                                                :
            - against -                          :       No. 05-CV-5222 (ERK)
                                                :
UNITED STATES OF AMERICA,                        :
                                                :
                          Respondent.           :
------------------------------------------------------------------------X

KORMAN, J.:

In 1995, after a jury trial before Judge Weinstein, petitioner Jack Ferranti ("Ferranti")
was convicted of arson homicide, arson conspiracy, sixteen counts of mail fraud and witness
tampering. Mario Ferranti, his brother, was tried with him and was convicted of arson
conspiracy. Jack Ferranti, the petitioner here, was sentenced to 435 months imprisonment, five
years supervised release, restitution, fines and special assessments. In June 2005, Ferranti filed
an application for an order certifying a second, or successive, habeas petition pursuant to 28
U.S.C. § 2255. The Second Circuit granted the application in part on July 13, 2005, holding that
Ferranti had made a *prima facie* showing that he satisfied 28 U.S.C. § 2244(b) by submitting
newly discovered evidence and remanded the case for a final determination whether Ferranti
"has satisfied the requirements for filing" a successive petition. *Ferranti v. United States*, 99-cv-
2332 (2d Cir. July 13, 2005).

## BACKGROUND

### I.        The Fire

Jack Ferranti owned and operated two retail clothing stores named "Today's Styles"
located at 66-45 Grand Avenue, Maspeth, Queens, and 104-08 Metropolitan Avenue, Forest

Hills, Queens. The store located on Grand Avenue in Maspeth occupied the first floor of a three-story building. The two upper floors consisted of four occupied residential apartments that housed eight people. (Trial Tr. 240.) Ferranti rented the store from Ripley Enterprises, a real estate management company, pursuant to a five-year lease running from February 1990 to February 1995. Under the lease terms, the rent payable increased in each year of the five-year term.

In the fall of 1991, Today's Styles was unprofitable. Due to construction on a bridge on the Long Island Expressway, which abutted the store, sales had declined substantially. (*Id*. at 343.) There were days when there were no sales at all, and even on the other days, store revenues were minimal. (*Id.* at 343, 354-358.) At times, the money in the cash box held in the store was insufficient to pay the weekly salary of one of Ferranti's employees. Ferranti offered to sell the store to another of his employees, but she declined because "business was bad." (*Id*. at 344.) Ferranti had fallen behind in his rent, failing to make payments in December 1991 and January 1992. (*Id*. at 251-52.) A check issued to Ripley Enterprises dated January 20, 1992 bounced. (*Id*. at 252-53.) The store's fire insurance premiums had not been paid, and a notice of cancellation had been sent to Ferranti on January 14, 1992. (*Id*. at 801-2.) On January 28, 1992, the fire insurance policy, which covered up to $200,000 in fire damage to the store's inventory, was reinstated. (*Id*. at 802.) Notably, Ferranti did not have fire insurance coverage on the other Today's Styles store in Forest Hills. (*Id*. at 806-7.)

On the night of February 24, 1992, only twenty-seven days after Ferranti renewed his fire insurance, a witness observed smoke billowing out of the building and called 9-1-1. The building soon became engulfed in flames, and the tenants in the upper-floor apartments fled for safety, in some cases wearing next to nothing. Firefighters had to force the doors to the store in

order to enter the building, as the doors were locked. (*Id.* at 78.) Two firefighters, Lieutenant Thomas A. Williams and Michael J. Milner, searched the front portion of the second floor, where another store was located, (*id.* at 211) for any tenants remaining in the building. Visibility on the second floor dropped dramatically, and Milner—following standard procedure—broke a showcase window to attempt to vent some of the smoke. (*Id.* at 145-46.) Lieutenant Williams called for a "May Day," and Milner yelled for help out of the broken window, but no help was forthcoming. (*Id.* at 147, 48.) Milner crouched by the window and saw a "shadow" pass by him. (*Id.* at 148.) The shadow was Lieutenant Williams, who had fallen out of the window and who died instantaneously. (*Id.* at 148-49.) In addition to the tragic death of Lieutenant Williams, two dozen firefighters received minor injuries and several tenants had to be treated for smoke inhalation. *United States v. Ferranti (Ferranti I)*, 928 F. Supp. 206, 210 (E.D.N.Y. 1996). The fire completely destroyed the building and all of the tenants' possessions stored inside.

After fleeing the building, tenants Shelly and Michelle Anthony briefly conversed with a man who inquired whether all of the tenants had managed to escape the building. (Trial Tr. at 708.) Shelly Anthony, a New York City Police Officer, later identified the man from a photograph array as Thomas Tocco, one of Ferranti's co-defendants. (*Id.* at 743.) Michelle Anthony selected two photographs from the array, one of which depicted Tocco. (*Id.* at 758-59.) Moreover, Beverly Danielius, who was visiting her mother-in-law in Maspeth, observed Tocco's dark Cadillac parked at a strange angle on Grand Avenue prior to the fire. (*Id.* at 690.) Minutes after Danielius's husband noticed smoke coming out of 66-45 Grand Avenue and called 9-1-1, Danielius saw that the dark Cadillac was gone. (*Id.* at 693.)

The next morning, fire marshals quickly suspected that the fire was a result of arson. Investigators noticed two distinct burn patterns located in the back of the store by the dressing

room area. Former Chief Fire Marshal John Stickevers and Supervising Fire Marshal James Kelty concluded, as they later testified, that the burn patterns were evidence of two puddles of flammable liquid accelerants that were used to start the fire. (*Id.* at 1379-81, 1521-24.) Investigators took samples of the floor near the burn patterns and a rug. The rug samples were tested and found negative for accelerants—a result that was inconclusive because large amounts of water (such as that used to extinguish a fire) may wash away traces of accelerants.[1] (*Id.* at 2000, 2008-09, 2045-46.) Investigators also found a portable electric heater plugged into the wall between the two burn patterns. (*Id*. at 1376-79.) Subsequent testing conducted by Special Agent William Tobin of the FBI determined that the device had not been energized at the time of the fire, and therefore, was not the cause. (*Id.* at 1079-80.) Consequently, investigators concluded that the heater was placed between the two pools of liquid accelerant as a decoy. (*Id.* at 1380-83.)

Moreover, investigators, firefighters, and insurance adjusters who observed the store shortly after the fire did not find any debris left from burned clothing, (*id.* at 100, 862, 1375) although employees had observed a full stock of inventory in the days before (*id.* at 360). As the insurance adjuster later testified, it was implausible that the clothing simply "disintegrated" (*id.*

---

[1] The floor samples were destroyed prior to trial without ever having been tested. Ferranti claims that this "destruction of evidence of what was the main evidence of arson, a so-called 'smoking gun,' is of vital significance to this case." (Pet'r Br. 7.) Specifically, he contends that the floor samples been available at trial, and that had they tested negative for accelerants, he would have been found innocent by the jury. Ferranti also implies that the destruction was somehow not "accidental," suggesting that there was a conspiracy among police and fire investigators to frame Ferranti because police believed that he was a "bad guy[]" doing "bad things." (*Id.*) Nevertheless, as noted above, even if the floor samples had not tested positive for accelerants, that fact would be inconclusive, as large amounts of water may wash away traces of accelerants. (Trial Tr. 2000, 2008-09, 2045-46.) Moreover, Ferranti's counsel cross-examined Fire Marshal Kelty regarding the destruction of the samples and established that Ferranti did not have an opportunity to examine, test or otherwise evaluate the samples prior to trial. (Trial Tr. 1440.) Kelty also testified on redirect that the destruction of the samples was not intentional. (*Id.* at 1490.) Although Ferranti is not convinced by the prosecution's proffered explanation for why the samples were destroyed, Ferranti has not presented any evidence of (and nothing in the trial record supports) a far-reaching conspiracy by police to frame him, except for his ranging unsupported allegations. *Cf. Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (unless defendant can show bad faith, police's failure to preserve potentially useful information does not constitute violation of due process).

at 863) and, if there had been clothing in the store at the time of the fire, "there should have been something left there," (*id.* at 865). Instead, there were "no hangers, nothing there." (*Id.*)

## II.     Investigation Subsequent to the Fire

The investigation immediately focused on Ferranti, but he was not located until a number of days after the fire. Once contacted, Ferranti falsely told the investigators that, on the date of the fire, he was visiting a girlfriend in New Jersey, although he was unwilling to provide her name. (*Id.* at 510.) Since his alibi was fabricated, he also was unable to corroborate his story in any way. (*Id.*) In a subsequent deposition related to his insurance claim, Ferranti admitted that he had lied to investigators, but claimed that he invented the alibi at the advice of his attorney. (*Id.* at 1704.) At trial, the attorney testified that he advised Ferranti not to answer any investigators questions if they became too "personal," but stated that he did not tell Ferranti to affirmatively lie to the police or to concoct a false alibi. (*Id.* at 1730-32.)

Ferranti also lied about the financial condition of Today's Styles, telling police that the store was "doing well." (*Id.* at 512.) When asked about possible causes of the fire, Ferranti mentioned the space heater as well as electrical problems at the store. (*Id.* at 523.) Ferranti later visited the store with investigators and identified the location where the heater had been found even though the heater had already been removed by fire investigators. (*Id.* at 1263.) When questioned about the space heater, Ferranti falsely stated that Gina Esposito, one of his employees, had purchased the heater a number of years prior to the fire. (*Id.* at 1389-90.) At trial, Esposito denied that she had purchased the heater. (*Id.* at 1700-01.) Moreover, the space heater recovered from the scene of the fire was a General Electric model heater that had not been manufactured since the late 1960's. (*Id.* at 373.)

Investigators questioned Ferranti about various employees that had access to the store. With respect to Teresa Rodriguez, who was responsible for closing the store on the night of the fire, Ferranti lied to the investigators, telling them that he did not know where she lived. In fact, Rodriguez lived in one of his buildings, which was located near Ferranti's real estate management office. (*Id.* at 443.) Moreover, after investigators left, Ferranti contacted Rodriguez and instructed her to lie to investigators about the space heater. Specifically, he instructed her to tell investigators that she had seen a space heater in the store that morning, and to deny that she had seen him the morning after the fire (although she had), in an attempt to corroborate his false alibi. (*Id.* at 565, 570-72.) Rodriguez and her sister-in-law, Charito Tejada, then instructed Rodriguez's friend Betzida Aviles, who had been in the store the day of the fire, to inform the police that she had observed a space heater in the store that day. (*Id.* at 576, 660.)

Rodriguez initially did as Ferranti instructed and lied to the police. (*Id.* at 571.) However, during a later interview with investigators, Rodriguez recanted her earlier statement and admitted that she had lied. (*Id.* at 574.) When contacted, Aviles, showing more fortitude than Rodriguez, told police that she did not observe a space heater in the store. (*Id.* at 660.) Other employees also corroborated Aviles's statement. (*Id.* at 358-59.)

In the subsequent weeks, Ferranti filed a claim with his insurance company for inventory losses due to the fire. (*Id.* at 1589.) The insurance company engaged outside counsel to handle the investigation, and counsel corresponded a number of times with Ferranti. Ferranti was examined under oath on June 2, 1992, where the insurance company's counsel, Ferranti, and Ferranti's counsel were present. (*Id.* at 1604.) Subsequently, on July 2, 1992, Ferranti withdrew his insurance claim. (*Id.* at 1610.)

### III.     Evidence at Trial

At trial, the prosecution called thirty witnesses, including several firefighters, fire investigators, police officers, employees of Today's Styles, insurance investigators and others. Those witnesses, whose testimony is summarized above, generally testified about the fire, Ferranti's motive for committing the arson (namely, the failing financial condition at the store), the subsequent investigation and Ferranti's obstructive conduct.  The prosecution also called the Anthonys and Beverly Danielius, who established Tocco's presence at Today's Styles at the time of the fire, and Vincent Marziano, a convicted felon, who had agreed to cooperate in exchange for immunity for other offenses he had committed.  At trial, Marziano testified about his friendship with Tocco as well as Mario Ferranti ("Mario")—Jack Ferranti's brother and also a co-defendant.  (*Id.* at 943-44.)  More specifically, Marziano testified that on the night of the arson, Tocco knocked at the window of Marziano's apartment in an agitated state.  (*Id.* at 952.) Tocco informed Marziano that he had just set fire to a building in Queens for Ferranti.  (*Id.* 951-53.)  Approximately one week later, Marziano approached Mario Ferranti at a bar where Marziano worked and cautioned Mario Ferranti, whom Marziano considered to be a closer friend, that Tocco had confessed their crime to Marziano.  (*Id.* at 954-56.)  Mario Ferranti responded affirmatively with a nod.  (*Id.*)

The prosecution also called Gina Esposito and her daughter, Lisa Ziccardi.  Before the grand jury, Esposito had testified that prior to the fire Ferranti had suggested to her that his problems with the store would be solved because it was heavily insured.  Esposito also testified that Ziccardi had informed her that Ferranti had said that he would set the store on fire if business continued to lag.  This testimony was consistent with Ziccardi's initial sworn affidavit taken by investigators.

When called to the stand at trial, however, Esposito initially feigned memory loss about Ferranti's statements to her as well as the conversation between Ziccardi and Ferranti. (*Id.* at 344-48.) Ziccardi also denied any recollection of her conversation with Ferranti. (*Id.* at 331.) Judge Weinstein determined that Ziccardi was potentially subject to contempt, and assigned her counsel. (*Id.* at 339.) The next day, Judge Weinstein conducted a hearing outside of the presence of the jury. During the hearing, Fire Marshal Robert Thomson testified that Ziccardi hand wrote her sworn affidavit in her own words. (*Id.* at 404-05.) The prosecution also called Peter Mazziotti, an insurance investigator, who spoke to Esposito in the course of his investigation. Mazziotti testified that Esposito had informed him about the conversation between Ziccardi and Ferranti.

Special Agent Cindy Pell testified that she had spoken to Ziccardi after her testimony on the previous day, and Ziccardi told Pell that she was nervous because Ferranti was "sitting right there." (*Id.* at 464.) Agent Pell also testified that Esposito believed that Ferranti had firebombed a truck parked on her property the day before she was scheduled to testify before the grand jury. (*Id.* at 464-65.) Judge Weinstein determined that Ziccardi and Esposito's failures of recollection were the result of coercion by Ferranti, and that he had effectively procured their unavailability as witnesses. (*Id.* at 476.) Judge Weinstein then held that their prior sworn statements were admissible pursuant to Federal Rule of Evidence 803(5) if the witnesses continued to refuse to testify truthfully. (*Id.*)

The prosecution then recalled Ziccardi, who reluctantly acknowledged that she overheard Ferranti state an intention to do an "insurance job" on his store. (*Id.* 603-06.) Esposito, when recalled to the stand, testified in a manner consistent with her original grand jury testimony, namely that Ferranti had suggested to her that his problems with the store would be solved

because it was heavily insured. (*Id.* at 613, 626.) Because the witnesses had truthfully testified, and were hence no longer unavailable, the prior statements were not admitted.

On the defense case, Ferranti called, *inter alia*, two expert witnesses who challenged the fire investigators' and marshals' determination that the fire was started as a result of arson. First, Thomas Klem, a consultant fire engineer who was formerly employed by the National Fire Protection Association, testified that the fire could have been caused by an electrical short circuit in the building, and that the two burn patterns observed on the floor did not necessarily reflect the use of liquid accelerants. (*Id.* at 1791, 1809.)

Ferranti also called Michael Higgins, a lock and chemical export, to testify that one of the locks on the front door of the store exhibited pick marks. (*Id.* at 2026.) Higgins also testified that no traces of accelerants were found by the NYPD chemist on samples of carpet and an electrical box that were recovered and tested from the store, although Higgins conceded that large quantities of water may wash away any traces of accelerants. (*Id.* at 2000, 2008-09, 2045-46.) Ferranti did not take the stand in his own defense, which left unrebutted most of the prosecution's case in chief.

The jury found Ferranti guilty on all counts.

## IV.    Sentencing

After trial, Judge Weinstein sentenced Ferranti on the arson-homicide charge principally to 435 months imprisonment and five years supervised release, noting that Ferranti "committed the arson for a financial advantage of some $50,000 in a possible insurance recovery and the breaking of an unprofitable lease." Judge Weinstein concluded that "[i]n view of [Ferranti's] extensive wealth, the avarice that put so many people at risk must be condemned by imposing the most severe [permissible] punishment." *Ferranti I*, 928 F. Supp. at 215.

## V.    Post-Trial Proceedings

After trial, Ferranti moved to vacate the arson-homicide conviction—arguing that the evidence on the interstate commerce element was insufficient—and the mail fraud conviction—on the basis that the evidence presented by the prosecution was insufficient to sustain the charge. Both motions were denied by Judge Weinstein. *See Ferranti I*, 928 F. Supp. at 213. The Second Circuit affirmed Ferranti's conviction and sentence, while it acknowledged that Ferranti raised a number of issues of "apparent legal substance," they turned out "upon close analysis, to be unpersuasive and only hopeful thoughts." *United States v. Tocco (Ferranti II)*, 135 F.3d 116, 120 (2d Cir. 1998).

Ferranti moved for post-conviction relief pursuant to 28 U.S.C. § 2255, arguing that (1) Marziano's testimony was materially false at trial such that a new trial was warranted; (2) Judge Weinstein erred at sentencing under *Apprendi* when he determined the degree of homicide under Section 2A of the Sentencing Guidelines; and (3) the prosecutor's failure to turn over evidence that the helmet worn by Lieutenant Williams, the firefighter who was killed, had been condemned by OSHA constituted a *Brady* violation. Judge Weinstein denied Ferranti's petition, and the Second Circuit affirmed. *Ferranti v. United States (Ferranti III)*, 6 Fed. Appx. 67 (2d Cir. 2001).

## VI.    Current Proceeding

Ferranti filed an application with the Second Circuit seeking authorization to file a successive habeas petition under 28 U.S.C. § 2255 in June 2005. Ferranti's application identified two claims:  one based on newly discovered evidence, and one based on the Supreme Court's decisions in *United States v. Booker* and *Crawford v. Washington*. The Second Circuit authorized the petition with respect to Ferranti's claims based on newly discovered evidence,

holding that Ferranti had made a *prima facie* showing that he satisfied the requirements of 28 U.S.C. § 2244(b), but denied with respect to the *Booker* and *Crawford* claims. Because a "*prima facie* showing" means simply a "sufficient showing of possible merit to warrant a fuller exploration by the district court," *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997) (Posner, *J.*), the threshold issue is whether Ferranti "has satisfied the requirements for filing" a successive petition, *Ferranti v. United States (Ferranti IV)*, 99-cv-2332 (2d Cir. July 13, 2005).

On remand to Judge Weinstein, a hearing was originally scheduled but then adjourned on the request of Ferranti's counsel. Petitioner's counsel then requested discovery into video tapes in possession of New York City related to the fire. Judge Weinstein granted the discovery request, and Ferranti and his counsel viewed the tapes at the U.S. Attorney's Office. After the viewing, Judge Weinstein set a briefing schedule, which was adjourned at the request of Ferranti's counsel. On April 17, 2006, Judge Weinstein recused himself from the case, and it was assigned to Judge Garaufis. After the matter was fully briefed, Judge Garaufis, *sua sponte*, ordered the parties to submit additional briefing of the effect of the guilty plea of Tocco on Ferranti's petition. Judge Garaufis noted that the plea was "high relevant to Petitioner's effort to show innocence," because it "undermines Petitioner's central argument in this successive motion, that the fire that was the subject of his trial was not an arson." *Ferranti v. United States*, 05-cv-5222 (E.D.N.Y. Nov. 3, 2008). Both the United States and Ferranti filed their responses on January 30, 2009. On August 10, 2009, the case was reassigned to me.

In this second post-conviction petition, Ferranti identified seven sources of newly-discovered evidence: (1) expert evidence from Gerald Hurst that established that the expert forensic testimony presented at Ferranti's trial was based on unsound scientific principles; (2) a videotape made by fire investigators on February 25, 1992; (3) handwritten notes from fire

investigator William Buchin; (4) a fire scene sketch that was attached to the United States' opposition brief; (5) notes of interviews with witness Shelley Anthony; (6) a latent fingerprint test report; and (7) reports regarding surveillance of Ferranti.

### a. **Gerald Hurst Expert Evidence**

Perhaps the most important sources of new information submitted by Ferranti are two declarations from expert Gerald Hurst, a consulting chemist and fire investigator. According to other materials submitted by Ferranti, Hurst has "analyzed numerous fires and ruled out arson to help free several defendants." Maurice Possley, *Arson Myths Fuel Errors*, Chicago Tribune, Oct. 18, 2004, *available at* http://www.chicagotribune.com/news/watchdog/chi-0410180222oct18,0,1571511.story.

Hurst's first declaration involves the gas chromatography/mass spectrometry analyses conducted by fire investigators in 1992. Hurst declared that the findings of the investigators with respect to the sample testing were "no different than would be expected after an accidental fire." (Hurst Decl.) Thus, he concluded that the "reported analytical results have no probative value, but might well be prejudicial to a jury if they were presented with the implication of support for an arson theory." (*Id.*) Hurst's second report addressed "the subject of advances in the science of fire investigation since the time of the Ferranti trial and their effect of these advances on the interpretation of the fire pattern evidence collected by the Fire Marshals." (*Id.*) Hurst's report was based on his review of video taken of the fire scene, and transcripts of trial testimony of Fire Marshals Thompson, Kelty and Stickevers and Insurance Investigation Mazziotti. Hurst's declaration challenged the conclusions of the investigators that the fire was intentionally set because of (1) the existence of two irregularly shaped burn patterns on the floor near the back of the floor and (2) the fact that a baseboard underneath the floor near the burn patterns was burned.

First, Hurst described some of the advances in fire science that have occurred since the Ferranti trial. Hurst explained that, during a phenomenon known as "flashover," a fire can generate a layer of hot smoke that exceeds 550°C, which will cause every combustible surface in the room to ignite. (*Id.*) In 1995, investigators were aware of the flashover phenomenon, but believed that it caused uniform burning. Consequently, investigators did not believe that irregularly shaped burn patterns could be generated by flashover. However, in 1997, the U.S. Fire Administration released a report entitled "USFA Fire Burn Pattern Test," which revealed that flashover can indeed cause irregular burn patterns with or without the presence of a liquid accelerant. (*Id.*)

Hurst also indicated that in 1995, investigators were taught to believe that liquid accelerants can burn downwards through floor coverings and wooden floors, however this belief was disproven sometime in 2001 or 2002. Hurst stated, therefore, that the fire investigators' conclusion that burning of the baseboard underneath the floor indicated the presence of a liquid accelerant was mistaken. In sum, Hurst concluded that "the prosecution's case failed to establish the corpus of arson by contemporary scientific standards." (*Id.*) In this regard his testimony was consistent with expert testimony of a defense witness at trial that the forensic evidence did not necessarily reflect the use of an accelerant. (Trial Tr. 1791, 1809.)

b. **February 25, 1992 Videotape**

In the immediate aftermath of the fire, investigators made video tapes of various portions of the store, presumably to generate a record of their investigation and to preserve images of the fire scene. After his conviction, Ferranti engaged in substantial FOIA and FOIL litigation with various entities of New York City and the United States, as a result of which, several videotapes were produced to Ferranti. In reviewing these tapes, Ferranti discovered that one tape, made on

February 25, 1992, had not been disclosed to Ferranti prior to trial. Ferranti refers to this tape as the "dripping tape" because the video shows water dripping. (Pet'r Br. 43.) The undisclosed tape consists of a six-minute segment, which shows some of the damage in the upstairs apartments in the building. The segment does not appear to show any part of the downstairs store, nor is there any commentary on the tapes regarding the cause of the fire. The reason this segment was not disclosed to Ferranti prior to trial is unknown. (Resp't Br. 26.)

Ferranti also seems to allege that other tapes were not disclosed prior to trial, or that the prosecution had redacted the audio portions of tapes that were disclosed. (Pet'r Br. 18-19, 44-45.) In support, Ferranti argues that his defense counsel's failure to utilize the videotapes at trial shows that they were withheld. (Pet'r Br. 45.) However, according to documents attached to the Memorandum of the United States Attorney, all tapes were disclosed to Ferranti prior to trial except for the February 25th "dripping tape," (Resp't Br., Exh. A) and Ferranti has offered nothing to rebut these documents. Moreover, although it is true that certain parts of the videotapes do not include audio, Ferranti has not offered any evidence that the audio ever existed nor has he explained what might have been said that would have been helpful to him.

c. **Buchin Notes**

Ferranti contends that handwritten notes from investigator William Buchin, which Ferranti later obtained through his FOIA/FOIL requests, were withheld from Ferranti prior to trial, although a written report that contains substantially all the information in the handwritten notes was produced. (Pet'r Br. 35-40.) Nonetheless, Ferranti argues that the location from which the rug samples were taken was not included in the final report, and that without the notes, there is no way to determine the location from which the rug samples were taken. According to Ferranti, "[b]y confirming the location of the rug sample, the defense is able to argue that the

other sample area, which was under the air conditioner, must be the location of the other wood floor sample they say was taken." (Pet'r Br. 36-37.) Thus, Ferranti claims that "the sample having been taken from under the air conditioning unit could not have been 'eyeballed' at all in the manner described by Kelty and Stickevers at trial." (*Id.* at 37-38.) Nevertheless, the location was also handwritten onto the canister that contained the rug samples, and it appears that the canister itself was produced to Ferranti prior to trial.[2] (Resp't Br. Exh. E, Exh. F.)

d. **Fire Sketch**

In his reply brief, Ferranti argues that the fire scene sketch attached to the United States' opposition brief had not previously been disclosed to Ferranti. (Pet'r Reply Br. 23-26.) Ferranti notes certain discrepancies between the sketch attached to the brief and previous sketches that had been provided prior to trial. Ferranti claims that had the sketch been available at trial, "it would be additional evidence neutralizing the fire investigator's claims with respect to the presence of the accelerant marks and the alleged location of evidentiary items including the fore samples." (*Id.* at 26.) Ferranti does not explain how this would be so.

e. **Notes of Shelly Anthony Interviews**

Ferranti further contends that interview notes regarding Shelly Anthony, which Ferranti obtained through his FOIA/FOIL requests, were withheld prior to trial, and that these notes could have been used to impeach Anthony and his wife more effectively. (Pet'r Br. 47-54.) Ferranti argues that the interview sheets, which reflect interviews with Anthony conducted on the night of the fire, do not mention their encounter with Tocco. (*Id.* at 47-48.) The United States contends that the interview notes were in fact disclosed to Ferranti, once on March 22, 1995 in connection with Ferranti's detention appeal and as part of the 3500 material. (Resp't Br. 31-32; Trial Exh.

---

[2] Ferranti admits that the rug sample was available to him prior to trial, but he contends that the *canister* was not. (Pet'r Reply Br. 14.) However, Ferranti has not submitted any evidence, such as an affidavit from his trial attorney, that the canister was not disclosed.

3500-14E.)  Ferranti did not respond to this argument except to argue that the 3500 exhibit was "curious" because it "purports to be 3500 material, but consists of a number of distinct, separate, reports."  (Pet'r Br. 51-52.)  However, the trial transcript clearly indicates that Kelty was asked about Exhibit 3500-14-E, (Trial Tr. 1424) indicating that it had been disclosed, and in any case, Ferranti has presented no evidence that it was not except for his "curiosity."

### f.  **Latent Fingerprint Test Report**

Ferranti argues that the prosecution withheld a latent fingerprint test report, which Ferranti believes involved fingerprint testing of the store ledgers, and that revealed that none of the fingerprints on the book were Ferranti's.  (Pet'r Br. 54.)  Ferranti does not describe the relevance of this fingerprint report or the lack of his fingerprints on the store ledgers.

### g.  **Surveillance Reports**

New York City Detective Edward Dowd testified regarding his investigation of the Grand Avenue fire.  He stated that in the summer of 1993, he observed Ferranti, Mario and Tocco standing by Ferranti's car, which was parked at Mario's house.  (Trial Tr. at 1280.)  Ferranti saw Dowd driving down the block, jumped in his car, and "took off at a high rate of speed."  (*Id.*) Ferranti argues that the prosecution withheld an FBI surveillance report dated September 1, 1993, which details surveillance conducted of Ferranti on August 10, 1993.  Ferranti argues that because the report apparently does not mention Ferranti fleeing at a high rate of speed after observing Officer Dowd, it could have been used to impeach Dowd's testimony.  (Pet'r Br. at 55-56.)

### DISCUSSION

After the passage of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), successive habeas petitions must satisfy two conditions to survive dismissal:

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, *but for constitutional error*, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2) (emphasis added). Even where the Court of Appeals has authorized the filing of a successive petition, its order authorizing the district court to review the petition does not foreclose the district court's independent review of whether the petition survives dismissal. This is so because, as previously observed, a "*prima facie* showing" means simply a "sufficient showing of possible merit to warrant a fuller exploration by the district court." *Bennett*, 119 F.3d at 469. Accordingly, AEDPA authorizes district courts to dismiss authorized successive habeas petitions that do not meet the above two requirements. 28 U.S.C. § 2244(b)(4). Indeed, as the Second Circuit explicitly stated when it authorized Ferranti's petition, "as provided by the applicable statutory provision…the district court may dismiss the motion—without reaching the merits—if it finds that petitioner has not satisfied the requirements for the filing of such a motion." *Ferranti IV*, 99-cv-2332 (2d Cir. July 13, 2005).

Assuming that the factual predicate for Ferranti's newly discovered evidence claim could not have been discovered through the exercise of due diligence, (*i.e.*, that he could meet the § 2244(b)(2)(B)(i) requirement), his petition nonetheless fails under § 2244(b)(2)(B)(ii) because he has not established that a constitutional error occurred at his trial or that "but for constitutional error, no reasonable factfinder would have found [Ferranti] guilty of the underlying offense."

## I.     Alleged Constitutional Error

Ferranti's claim of alleged constitutional error is a *Brady* claim based on the failure to timely disclose evidence. In order to sustain a due process claim under *Brady v. Maryland*, a

habeas petitioner must show: (1) the evidence at issue is favorable to the petitioner, either because it is exculpatory or it is impeaching; (2) the evidence was suppressed by the prosecution, willfully or inadvertently; and (3) prejudice. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). To satisfy the prejudice requirement, a petitioner must show a "reasonable probability of a different result" had the material been timely disclosed. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Here, each claim of undisclosed evidence fails either the first or second *Brady* requirement or both. The video tape evidence, which consisted of a six-minute segment showing areas of the building that were not relevant to the fire investigation, was not disclosed, but it is neither exculpatory nor impeaching. Ferranti's contention that the ceiling charring shown in the videotape supports an accidental-fire theory appears to be undermined by the fact that the videotape shows the ceiling of the upstairs apartments and not the store below, where the fire started, (Trial Tr. 187, 211). The Buchin notes, which Ferranti claims is relevant because it contained the location from which the rug sample was taken, may not have been made available prior to trial. Nevertheless, all evidence indicates that he was given the can containing the rug, which contained the information that Ferranti complains was withheld. Moreover, even if the location of the rug sample was not disclosed to Ferranti, it is hard to see how that information would be exculpatory or impeaching, since the rug sample tested negative for the presence of any liquid accelerants. At best, the evidence would help neutralize the testimony of the fire investigators that the burn patterns indicated the presence of an accelerant. However, as discussed below, even assuming the investigators' testimony was given no weight, Ferranti still could not establish that the result of his trial would be any different because the other evidence at trial was so overwhelming.

The fire scene sketch similarly does not aid Ferranti, because it is not exculpatory. The Anthony notes appear to have been turned over prior to trial. Moreover, even if the notes were not available prior to trial and could have been used to impeach the Anthonys' testimony placing Tocco at the scene of the fire, Ferranti has no answer to the testimony of Beverly Danielius, who observed Tocco's vehicle near the store before the fire.[3] The fact that the latent fingerprint test of the store ledger did not yield Ferranti's fingerprints proves nothing. Moreover, even if the surveillance report of Officer Dowd was withheld and could have been used to impeach his testimony, the latter's testimony with regard to an event that occurred after the fire, when viewed against the overwhelming case against Ferranti, was not significant.

Taken as a whole, none of the allegedly undisclosed evidence is material, because there is no reasonable probability that it would have affected the outcome of a trial in which the evidence of motive and intent to commit the arson was not only overwhelming but was corroborated by uncontroverted evidence establishing consciousness of guilt, including (as Judge Weinstein found) Ferranti's effort to procure the unavailability of key prosecution witnesses. Those witnesses ultimately testified that prior to the fire Ferranti had suggested that his problems with the store would be solved because it was heavily insured.

## II.    Likelihood of Acquittal

Assuming that Ferranti could establish that an error of constitutional magnitude occurred, the § 2244(b)(2)(B)(ii) requirement nonetheless is a hurdle he cannot overcome. The error that

---

[3]    Ferranti argues that Shelly Anthony's identification of Tocco is further discredited by the fact that Anthony failed to recall anything "distinctive" about Tocco's voice, despite the fact that Tocco spoke with an "unforgettable" raspy voice. (Pet'r Br. 50.) Nevertheless, the reliability of the identification is confirmed by other compelling evidence of his guilt. *See Brisco v. Ercole*, 565 F.3d 80, 95 (2d Cir. 2009) (Cabranes, *J.*); *id* at 99 (Korman, *J.*, concurring). Ferranti also implies that Anthony's identification of Tocco from a photographic array was deficient because Anthony was "pal-pal" with Officer Dowd. Ferranti submits no evidence in support of his allegation that Anthony and Dowd were friends. In fact, Michelle Anthony testified that she did not know Officer Dowd prior to the Ferranti investigation. (Trial Tr. 782.) Moreover, Tocco ultimately pled guilty, and, as noted above, another witness, Beverly Danielius, observed Tocco's car near the store before the fire.

Ferranti claims—the failure to turn over *Brady* materials—provides a basis for relief on direct appeal or on an initial *habeas* petition upon a showing of a reasonable probability that the verdict would have been different. *Kyles*, 514 U.S. at 434. This comparatively lenient standard does not even require the petitioner to establish that it was more likely than not that the verdict would have been affected. *Id.* at 434. By contrast, the gateway standard requires the petitioner to show by clear and convincing evidence that, but for the *Brady* violation, "no reasonable factfinder would have found the applicant guilty of the underlying offense." Indeed, the hurdle that this standard imposes has been equated to a showing of "a high probability of actual innocence." *Gonzalez v. Crosby*, 545 U.S. 524, 530 (2005). Indeed, this standard is more stringent than the pre-AEDPA gateway standard for filing a successive petition articulated in *Schlup v. Delo*, which itself was quite difficult to satisfy, *see House*, 547 U.S. at 538 ("[I]t bears repeating that the *Schlup* standard is demanding and permits review only in the 'extraordinary' case."). As the Court of Appeals for the Ninth Circuit has observed:

> The AEDPA requirements for a second or successive application are stricter than the *Schlup* standard in two ways. First, § 2244(b)(2)(B)(i) requires that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence." There is no requirement under *Schlup* that the factual claim was not discoverable through the exercise of due diligence. Second, § 2244(b)(2)(B)(ii) requires that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." (Emphasis added.) *Schlup* requires only that an applicant show that it is "more likely than not" that no reasonable fact-finder would have found him guilty.

*Cooper v. Woodford*, 358 F.3d 1117, 1119 (9th Cir. 2004). Consequently, even if Ferranti could establish a *Brady* violation, it would not be sufficient to satisfy the gateway standard.

Moreover, when considering whether a petitioner has satisfied the AEDPA gateway standard, the court is not "bound by the rules of admissibility that would govern at trial," but instead must consider "all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995).

Here, considering all of the evidence, Ferranti simply has not established that no reasonable factfinder would have found him applicant guilty of the underlying offense. Even assuming that Hurst's declaration is credible, at best it would neutralize the testimony of Fire Marshals Stickevers and Kelty that the irregular burn patterns were evidence of the presence of accelerants.[4] Hurst declared that the irregular burn patterns seen here may result from post-ignition flashover, and as such, they were equally consistent with an accidental fire as they were with arson. What Hurst's declaration does not say, however, is that the fire was initiated by an electrical malfunction or some other accidental means. Indeed, to some extent it is duplicative of the expert testimony offered by Ferranti at trial to the effect that the forensic evidence did not necessarily reflect the use of a liquid accelerant. (Trial Tr. 1791, 1809.) Moreover, much of the

---

[4]     Ferranti also argues that Kelty testified that other things "cause 'similar looking patterns,' for instance, a 'drop down' of clothing." (Pet'r Br. 4-5.) Consequently, because all of the debris in the store had been "pushed to the side; [Kelty] and Stickevers thus did not know what *had* been on top of the burn area," implying that perhaps the burn patterns had been caused by some other phenomena besides a liquid accelerant. However, on redirect, Kelty testified that after closer examination of the char patterns on the floor, he ruled out fallen clothing as a possible cause of the patterns because they failed to exhibit "tunneling." (Trial Tr. 1495-95.) In other words, as Kelty described:

> When clothing drops, as anyone knows, it…will crumple….[B]asically what happens is the burns on the floor while they're low level burns, the burning on the floor will be a result of the combustible material, in this case as I'm discussing a shirt or piece of clothing, that part where it hits the floor will have charring with the floor but the parts that are clumped up and are away from the floor will not have burning on the floor.

(*Id.* at 1495.)

other evidence submitted by Ferranti (*i.e.*, the Buchin notes, the fire sketch, etc.) or alluded to in his brief (*i.e.*, the fact that the previous tenant may have stored flammable liquids, which could have caused the burn patterns; or the fact that the floor tiles contained a "petroleum-based product" which could have created the burn patterns) serves only to neutralize the testimony of the Stickevers and Kelty regarding the burn patterns, but none of that evidence establishes that the fire was started accidentally.

In the context of DNA testing, the Supreme Court has recently noted that where there is other incriminating evidence, "science alone cannot prove a prisoner innocent," *Dist. Attorney's Office v. Osborne*, 129 S. Ct. 2308, 2316 (2009), and here, the weight of the other incriminating evidence against Ferranti is crushing. Again, the evidence introduced regarding the economic condition of the store, the increasing rent from year-to-year, the fact that Ferranti renewed his fire insurance shortly before the arson,[5] the fact that Ferranti only held fire insurance on his Grand Avenue store (and not the Metropolitan Avenue store), and the reluctant testimony from Esposito and Ziccardi indicating that Ferranti told them he would burn down the store if the financial condition did not improve all established Ferranti's motive and intent to commit arson. Ferranti's obstructionist conduct (including lying—and convincing employees of the store to lie—to investigators) and improper attempts to prevent witnesses from testifying at trial established his consciousness of guilt. Moreover, the testimony from the Anthonys established

---

[5]    Ferranti suggests that the insurance was renewed because Ferranti's landlord required it. (Pet'r Br. 24 n. 13.) Nevertheless, John Horan, a representative from the management company that leased the Grand Avenue building to Ferranti, testified that Ferranti's lease required him to hold only general liability insurance (*i.e.*, "in case somebody falls or gets hurt in the store"). (*Id.* at 254-55.) Indeed, he specifically testified that the lease did not require Ferranti to purchase fire insurance on the store's inventory. (*Id.*) Moreover, Ferranti also suggests that a grace period on his insurance policy would have covered damage to inventory at the store for 30 days after the policy lapsed, and hence the renewal of the fire insurance was not significant. (Pet'r Br. 24 n.13.) While Ferranti's policy did include a grace period, (Trial Tr. 826) a representative from the insurance company testified that the date of the fire, February 24, 1992, fell outside of the grace period, and consequently, had Ferranti not renewed his insurance, he would not have been covered on that date (*id.* at 829).

that Tocco was present at the store at the time of the arson. Even if Ferranti's argument that the interview sheets of Shelly Anthony would have effectively impeached his testimony were to be fully credited, Ferranti still has not overcome the testimony of Beverly Danielius, who also placed Tocco, through his vehicle, at the scene of the fire.

Moreover, Marziano testified that Tocco indicated that he had just set fire to a building in Queens for Jack Ferranti, and that after approaching Mario Ferranti with Tocco's statement, Mario Ferranti nodded affirmatively. Ferranti argued in his first § 2255 petition that evidence discovered after the trial rendered Marziano's testimony materially false. Specifically, Ferranti argued that although Marziano testified at trial that when Tocco confessed to him he lived at one location, he in fact lived at another location. However, the Second Circuit rejected Ferranti's petition, holding that the non-disclosure of Marziano's testimony was not material to Ferranti's conviction, citing other persuasive evidence of Ferranti's guilt. *Ferranti III*, 6 Fed. Appx. at 67-68. Because analysis of the gateway standard requires consideration of "all the evidence," Ferranti takes another bite at the apple—again raising several concerns about Marziano's testimony, including the argument raised in his first unsuccessful petition as well as several arguments made at trial, such as the fact that Marziano came forward with information regarding Ferranti when "Dowd came to see Marziano in his cell and told Marziano that the police (and prosecutor) wanted information concerning Tommy Tocco and Mario Ferranti burning a building in Queens for Jack Ferranti." (Pet'r Br. 9.) Ferranti alleges that "Marziano, a predicate felon who knew the ropes and very much wanted to extricate his girlfriend (who had been arrested with him), gave the police what they wanted: he reported that on the night of the fire, Tocco had 'confessed' that he committed the arson with Mario 'for Jack' Feranti." (*Id.*)

Ultimately, the inconsistent testimony regarding Marziano's location at the time that Tocco confessed to him pales in comparison to the other impeaching evidence the jury heard. Moreover, the manner in which Marziano's testimony was obtained was extensively raised during the trial, yet the jury found Ferranti guilty. Indeed, it can fairly be said that a jury would not have convicted Ferranti based on Marziano's uncorroborated testimony alone. Petitioner's problem is that Marziano's testimony was compellingly corroborated by circumstantial evidence, including Ferranti's uncontroverted admission that he would set the store on fire if business continued to lag. Indeed, as the Second Circuit held, the other evidence of guilt is simply overwhelming. *Ferranti III*, 6 Fed. Appx. at 67-68.

Moreover, after Ferranti was convicted and sentenced, co-defendant Tocco, who was not tried with Ferranti and Mario, pled guilty to one count of conspiracy to commit arson on August 18, 1995. At his Rule 11 hearing, Tocco allocuted to the elements of the offense, but it was a "bare bones allocution." (Tocco Plea Hr'g 2.) Tocco indicated that although he was pleading to conspiracy, he would not "implicate any specific individuals whatsoever" or "name names." (*Id.*) Nonetheless, he admitted that he "conspired with another person to start a fire" at "66-45 Grand Avenue." (*Id.* at 3-4.) Tocco's plea establishes that the fire was set intentionally, contrary to Ferranti's claims. In response to Judge Garaufis's order for additional briefing on this issue, Ferranti submitted a declaration from Margaret Clemons, a licensed private investigator, who Ferranti hired to speak to Tocco in prison. According to Clemons, Tocco told her that "he did not set the fire," and he "had never been to the building where the fire took place and did not even know where the building was located." (Clemons Decl. ¶¶ 4, 5.) The credibility of Tocco's unsworn hearsay statements are undermined by the fact that he is already incarcerated and has nothing to lose by lying, and they are contradicted by his sworn plea colloquy as well as the

testimony of the Anthonys and Beverly Danielius at trial, who placed Tocco at the scene on the night of the fire.

Finally, in assessing the overall nature of the evidence of guilt, it is not without significance that Jack Ferranti failed to take the witness stand at his own trial, he did not speak at his sentencing, and he failed to file any affidavit in connection with his petition addressing the evidence against him or asserting that he was actually innocent. The only affidavit he has submitted to date was in support of a motion for resentencing, in which he stated that he had "no intention to kill anyone." (Ferranti Affirmation ¶ 4, *United States v. Ferranti*, 95-cr-119 (E.D.N.Y. Jan. 12, 2009).) I refer to this not to draw any inference from his failure to affirm his innocence under oath. Although such an inference would not be permissible at trial, it is not clear that it would be impermissible to consider it along with other inadmissible evidence for present purposes. Nevertheless, I refer to it only to evaluate the totality of the evidence necessary to determine whether Ferranti can meet the AEDPA threshold for filing a successive petition. Obviously, a plausible explanation of the otherwise compelling evidence against him would affect any such assessment, so too does the absence of absence of such an explanation. *See United States v. Male Juvenile*, 121 F.3d 34, 42 (2d Cir. 1997) ("Rather than drawing an adverse inference, the district court was simply indicating that, by not testifying, defendant had failed to contradict the government's evidence with his own testimony.").

Although the facts of each case are unique, particularly when assessing whether a petitioner satisfies the AEDPA gateway requirement, the Third Circuit's opinion in *Albrecht v. Horn* is instructive. 485 F.3d 103 (3d Cir. 2007). There, a state prisoner in Pennsylvania had been convicted of murder and arson, and petitioned for habeas relief arguing, much like Ferranti, that the fire that killed his wife, his mother and his daughter was not an arson. At his habeas

hearing, Albrecht called a fire engineering expert who testified that the observations that fire investigators relied on to conclude that the fire was an arson (*e.g.,* burn patterns on the floor, a "V" shaped pattern on the walls and blistering of wood, called "alligatoring") were now understood to be consistent with accidental fires as well as arsons. The district judge credited the fire expert statement, but nonetheless denied Albrecht's petition, because the expert could not rule out the possibility of arson, and there was "ample other evidence of guilt," including "Albrecht's pattern of hostility and violence directed toward Mrs. Albrecht, his attempt to purchase gasoline to put in a can the day before the fire, the immediate discovery of the empty hydraulic oil can in the trunk of his car that tested positive for gasoline, and his numerous threats to burn down the house and do further harm to his wife." *Id.* at 125. Similarly here, although Hurst's testimony may refute the evidentiary value of the burn patterns, Hurst does not expressly rule out the possibility of arson, and there is ample other evidence of Ferranti's guilt. Indeed, after reviewing the uncontradicted compelling evidence of Ferranti's motive, intent and consciousness of guilt, I cannot conceive of a jury finding him not guilty.

## CONCLUSION

Ferranti has failed to satisfy the gateway requirement under § 2244(b)(2) that he show by clear and convincing evidence that but for the alleged *Brady* violation, no reasonable factfinder would have found him guilty of arson. The application to file a successive petition is denied.

SO ORDERED.

Brooklyn, New York
January 26, 2010

*Edward R. Korman*

Edward R. Korman
Senior United States District Judge